

# In the Missouri Court of Appeals
## Western District

TIFFANY K. (MAHAFFEY) BRIZENDINE,   )
                         **Appellant,**   )
                                    )

v.                                     )         WD78228
                                    )

BARTLETT GRAIN CO., LP,          )        **FILED:** December 22, 2015
                     **Respondent.**   )

## APPEAL FROM THE CIRCUIT COURT OF JACKSON COUNTY
### THE HONORABLE JOEL P. FAHNESTOCK, JUDGE

### BEFORE DIVISION TWO: MARK D. PFEIFFER, PRESIDING JUDGE,
### LISA WHITE HARDWICK AND JAMES E. WELSH, JUDGES

Tiffany Brizendine appeals the circuit court's judgment finding against her and in favor of Bartlett Grain Company ("Bartlett") on her petition for damages after she was injured on Bartlett's property. Brizendine contends the court erred in refusing her withdrawal instruction regarding certain evidence, in allowing Bartlett to argue her negligence based upon that evidence in closing argument, and in allowing Bartlett to cross-examine her about the circumstances surrounding her change of employment after her injury. For reasons explained herein, we affirm.

### FACTUAL AND PROCEDURAL HISTORY

Around 7:00 p.m. on October 29, 2011, there was an explosion at Bartlett's grain elevator in Atchison, Kansas. Brizendine, a canine search and rescue

volunteer with the Metro Canine Group, received a text message asking her to report to the scene. In addition to taking her dog, Brizendine took her "go-bag" of gear, which contained, among other things, two flashlights and a hard hat with a headlamp on it.

Brizendine arrived in Atchison around midnight. Susan Wexter, another volunteer with the Metro Canine Group, arrived at the same time as Brizendine. They were met by a police officer, who escorted them into the gated area surrounding the grain elevator. Access to the gated area was limited to law enforcement officers, fire fighters, rescuers, and paramedics. A police officer directed Brizendine to park her vehicle on a largely-graveled parking lot near the grain elevator.

It was very dark in the parking lot when Brizendine and Wexter arrived. Huge, bright, temporary lights run by generators were pointed at the grain elevator, but there was "very little backlighting" from them shining on the parking lot. Lights from the emergency vehicles in the parking lot were not flashing. While headlights from cars that were stopped at the gate entrance provided some light, no lights were on in the parking lot itself. Because it was so dark in the parking lot, Wexter put her headlamp on her hard hat as soon as she got out of her car, and she may have had her flashlight with her as well. Another canine search and rescue volunteer at the scene, Jake Ring, turned on his flashlight immediately upon exiting his car so that he would not be walking around in the dark. Brizendine, who had never been to the scene before that night and was unfamiliar with the terrain,

did not put on her headlamp or use her flashlights even though she, too, thought it was "very dark."

Brizendine checked herself and Wexter in at the command post. Afterwards, Brizendine and Wexter decided to "break" their dogs, which means allow the dogs to relieve themselves. Wearing her headlamp, Wexter walked over to a grassy area to break her dog. Brizendine walked with her dog to a different grassy area at the edge of the gravel parking lot, eight to ten feet away from where she had parked. As Brizendine and her dog left the gravel and entered the grassy area, they both stepped off and went down one and one-half to two feet into a ditch. Brizendine heard a pop and a cracking noise and tried to get up two or three times, but she could not put any weight on her right leg. Brizendine later learned that she had sustained a right tibial pilon fracture, which is a fracture that involves the weight-bearing surface of the ankle joint. The injury required her to have multiple surgeries and to undergo physical therapy. She continues to have mobility issues and is limited in her ability to perform certain physical activities.

At the time of her injury, Brizendine was employed as a security specialist for Cerner Corporation. Before her injury, she had applied for an emergency management position at KU Medical Center. Brizendine interviewed for that position from her hospital bed after her injury, but another person was hired for the job. After recuperating, she returned to her job at Cerner, with certain accommodations. In October 2012, Brizendine began working as a security specialist at KU Medical Center, where her husband worked as a police officer.

3

In April 2013, Brizendine filed a petition for damages against Bartlett in the Circuit Court of Jackson County, the county where she resides. Her petition alleged that Bartlett was negligent for failing to barricade the ditch or warn of its existence. She sought damages for hospitalization, medical care, treatment, and surgery; pain and anguish; lost employment, income, and earning capacity; and future medical treatment. In its answer, Bartlett denied Brizendine's allegations and asserted several affirmative defenses, including Brizendine's comparative fault for failing to keep a careful lookout and for failing to take necessary precautions in the existing conditions in walking from a graveled parking lot toward an area of overgrown vegetation, which referred to her non-use of a headlamp or flashlight. During the jury trial, Bartlett tendered two comparative fault instructions, one for failure to keep a careful lookout and the other for failure to take necessary precautions by using a headlamp. The court refused the separate instruction for failure to use a headlamp, finding that the failure to keep a careful lookout instruction encompassed the failure to use a headlamp or flashlight. Following a trial, the jury found that Brizendine was 100% at fault. The court subsequently entered a judgment against Brizendine and in favor of Bartlett. Brizendine appeals.

STANDARD OF REVIEW

Brizendine's seven points on appeal challenge the circuit court's refusal of her proposed withdrawal instruction and its rulings allowing certain closing argument and cross-examination. We review all of these rulings for an abuse of discretion. *Swartz v. Gale Webb Transp. Co.*, 215 S.W.3d 127, 129-30 (Mo. banc

4

2007) (withdrawal instruction); *Gleason v. Bendix Commercial Vehicle Sys., LLC*, 452 S.W.3d 158, 178-79 (Mo. App. 2014) (closing argument); *Oliver v. Ford Motor Credit Co.*, 437 S.W.3d 352, 364 (Mo. App. 2014) (cross-examination). The circuit court abuses its discretion "'when a ruling is clearly against the logic of the circumstances then before the court and is so arbitrary and unreasonable as to shock the sense of justice and indicate a lack of careful consideration.'" *Swartz*, 215 S.W.3d at 130 (citation omitted).

Because the alleged tort occurred in Kansas, Kansas law determines the question of Bartlett's negligence. *See Wilson v. Image Flooring*, LLC, 400 S.W.3d 386, 397-98 (Mo. App. 2013) (citing *Kennedy v. Dixon*, 439 S.W.2d 173, 185 (Mo. banc 1969)). Missouri law governs all procedural issues in the case. *Clair v. Monsanto Co.*, 412 S.W.3d 295, 303 (Mo. App. 2013).

### ANALYSIS

In her first six points, Brizendine argues that the court abused its discretion by refusing to give the jury an instruction withdrawing "[t]he evidence and issue of whether plaintiff used a headlamp or flashlight before falling into the drainage ditch." Brizendine argues that the court further erred by allowing Bartlett to argue that her failure to use a headlamp or flashlight constituted evidence of her negligence.

Brizendine was the first party to raise and to offer evidence at trial on the issue of the use of a headlamp or flashlight. Brizendine's counsel mentioned in his opening statement that, in preparing Brizendine's case against Bartlett, he "had to

5

determine if she had done anything wrong." He told the jury that one of the things he considered in making that determination was the outfit that Brizendine was wearing that night, which he told the jury included a hard hat with a headlamp. He did not mention that the evidence would show that she was not wearing the headlamp when she was injured. Later, during Brizendine's case-in-chief, Wexter and Ring testified on direct and cross-examination that they had either a headlamp (Wexter) or a flashlight (Ring) with them in the parking lot because it was so dark. Brizendine testified on cross-examination that, while she had her headlamp and two flashlights with her on the night of her injury, she never took them out of her gear bag. She explained that, even though it was "very dark" and she was unfamiliar with the terrain of Bartlett's property, she did not believe that she needed the lighting equipment because the gravel parking lot and the grassy area around it constituted the "safe zone" for emergency responders. According to Brizendine, it "didn't occur to [her] that the grass wasn't actually grass, that it was a drop-off." In its closing argument, Bartlett argued that Brizendine was at fault for her injury because, unlike Wexter and Ring, she chose to walk into a very dark and unfamiliar area without using her headlamp or a flashlight.

The circuit court has discretion to submit withdrawal instructions to the jury under the following circumstances:

> "Withdrawal instructions may be given when evidence on an issue has been received, but there is inadequate proof for submission of the issue to the jury; when there is evidence presented which might mislead the jury in its consideration of the case as pleaded and submitted; when there is evidence presented directed to an issue that

6

is abandoned; or when there is evidence of such character that might easily raise a false issue."

*Haffey v. Generac Portable Prods.*, L.L.C., 171 S.W.3d 805, 810 (Mo. App. 2005) (quoting *Stevens v. Craft*, 956 S.W.2d 351, 355 (Mo. App. 1997)). In this case, Brizendine argues that evidence of her failure to use her headlamp or flashlight positively misled the jury (1) about her non-existent duties to anticipate and take precautions against a concealed danger on Bartlett's premises; (2) that the scope of her duty to keep a careful lookout included using assistive devices instead of her ordinary sight and hearing; and (3) that the ditch could have been seen by using a headlamp or flashlight.

In its answer, Bartlett pled the affirmative defense that Brizendine was comparatively negligent for failing to keep a careful lookout. At trial, the circuit court instructed the jury on Brizendine's comparative fault, using an instruction patterned off of MAI 32.28:

> In your verdict you must assess a percentage of fault to plaintiff if you believe:
>
> First, plaintiff knew or by using ordinary care could have known that there was a ditch on defendant's premises and as a result the premises were not reasonably safe, and
>
> Second, plaintiff failed to use ordinary care to keep a careful lookout, and
>
> Third, such failure directly caused or directly contributed to cause any damage plaintiff may have sustained.

As used in the instruction, the phrase "ordinary care" refers to "that degree of care that an ordinarily careful person would use under the same or similar

7

circumstances." MAI 11.05. These MAI instructions are consistent with Kansas law, which defines negligence as "'the lack of ordinary care' or, more specifically, 'the failure of a person to do something that a reasonably careful person would do, or the act of a person in doing something that a reasonably careful person would not do, measured by all the circumstances then existing.'" *Deal v. Bowman*, 286 Kan. 853, 188 P.3d 941, 946 (2008) (citation omitted).

The circumstances existing at the time Brizendine sustained her injury were that she was in an unfamiliar area with unfamiliar terrain and it was, by her own admission, very dark. Under Kansas law, "[t]he amount of light was a factor relevant to an appraisal of plaintiff's duty to anticipate peril and would figure strongly in determining whether [she] acted as a reasonably careful person under the circumstances--the standard by which [her] conduct is to be measured." *Kirsch v. Dondlinger & Sons Constr. Co.*, 206 Kan. 701, 482 P.2d 10, 14 (1971). This is because "[d]arkness is always a signal of danger." *Kurre v. Graham, Ship By Truck Co.*, 136 Kan. 356, 15 P.2d 463, 466 (1932). Where the plaintiff is traveling an unfamiliar course and is confronted with darkness, it is her "duty, under such circumstances, to refrain from proceeding further without finding out where [she] might safely go." *Id*. *See also Birt v. Drillers Gas Co.*, 177 Kan. 299, 279 P.2d 280, 284 (1955) (finding that the plaintiff, who was injured when she fell in a hole after stepping off a gravel drive into grass in dimly-lit area, did not exercise reasonable care for her own safety); *Thompson v. Beard & Gabelman*, 169 Kan. 75, 216 P.2d 798, 802 (1950) (stating that the plaintiff, who was injured when

8

she wandered from the main part of a store and fell down basement stairs, was negligent for "travelling a course she did not know" in a dimly-lit area); *Donaldson v. Kemper*, 152 Kan. 533, 106 P.2d 1051, 1052 (1940) (noting that, "[i]f the plaintiff did enter the dark furnace room and walk about in it on a course of her own choosing when she could not see any dangers that might lurk there, she was guilty of contributory negligence").  That Brizendine, unlike her colleagues Wexter and Ring, chose to walk around in a very dark and unfamiliar area without her headlamp or flashlight was relevant to whether she acted as a reasonably careful person under the circumstances.

Brizendine argues that she cannot be found negligent because she had no duty to "look out for danger on the premises where there [wa]s no reason for an ordinarily prudent person to apprehend any," citing *Bingham v. Hillcrest Bowl, Inc.*, 199 Kan. 40, 427 P.2d 591, 596 (1967); *Marietta v. Springer*, 193 Kan. 266, 392 P.2d 858, 862 (1964); and *Little v. Butner*, 186 Kan. 75, 348 P.2d 1022, 1031 (1960).  She asserts that "high-standing weeds a few feet from the parking area cannot reasonably constitute a warning that beneath them is a steep-banked drainage ditch."  The difference between *Bingham*, *Marietta*, *Little*, and this case, however, is that the accidents in those cases occurred either in daylight or in lit areas with which the plaintiffs were familiar.  Under those circumstances, there was no reason for an ordinarily prudent person to apprehend any danger.  Here, however, both the darkness and unfamiliarity with the area were two very good reasons for an ordinarily prudent person to anticipate danger.  *See Kirsch*, 206 Kan.

9

at 706, 482 P.2d at 14; *Birt*, 177 Kan. at 304, 279 P.2d at 284; *Thompson*, 169 Kan. at 80, 216 P.2d at 802.  Although Brizendine contends that, even with the darkness and her unfamiliarity with the area, she believed that she did not have to anticipate danger because she was in the "safe zone" of the emergency site, whether her belief and her actions based on that belief were reasonable were issues for the jury to decide.

Brizendine also cites *Little* for the proposition that the headlamp and flashlight evidence should have been withdrawn because she had no duty to use such "assistive devices" instead of her own senses of sight and hearing.  The plaintiff in *Little* was injured in a grocery store after slipping on meat samples that had been dropped by other customers.  *Little*, 186 Kan. at 78, 348 P.2d at 1027.  In discussing the plaintiff's possible negligence, the court stated, "Upon entering a store, *a mature and normal customer must make reasonable use of his faculties for his own protection* and in the interest of his safety he is required to use that degree of care which a person of ordinary prudence would exercise under the same or similar circumstances."  *Id*. at 84; 348 P.2d at 1031 (emphasis added).

Relying on the italicized language, Brizendine argues that the scope of her "duty of self-protection" while she was on Bartlett's property extended only to her using her senses of sight and hearing without the aid of a headlamp or flashlight.  We disagree.  As noted, the accident in *Little* occurred under well-lit conditions in a place with which the plaintiff was familiar.  In such circumstances, making reasonable use of one's sight and hearing would provide the degree of care that an

10

ordinarily prudent person would be expected to exercise. Forgoing a headlamp or flashlight and relying solely on one's senses of sight and hearing in a very dark and unfamiliar area with unfamiliar terrain is a completely different situation. "It is an elementary rule of law that every person must exercise ordinary and reasonable care for his own safety and not expose himself to unnecessary risks, dangers or hazards in performing his duties." *Anderson v. Cooper*, 192 Kan. 723, 391 P.2d 86, 91 (1964). Brizendine's failure to use her headlamp or flashlight under the circumstances as they existed at the time of her injury was directly relevant to whether she exercised ordinary and reasonable care for her own safety and did not expose herself to unnecessary risks, dangers, or hazards.

Brizendine further asserts that the court should have withdrawn the headlamp and flashlight evidence because there was no substantial evidence showing that a headlamp or flashlight would have more likely than not illuminated the ditch well enough to provide her notice of the danger.[1] To support her argument, Brizendine relies on the testimonies of Wexter and Ring, both of whom testified that, even with their headlamp and flashlight, respectively, they were not able to see the ditch. Wexter testified that the ditch looked "like a flat area" and

---

[1] In her reply brief, Brizendine specifically states that she is not contesting the submission of the comparative fault instruction for failure to keep a careful lookout; instead, she is contesting that her failure to use her headlamp or flashlight is proper evidence to support that instruction. An instruction for failure to keep a careful lookout "is not to be given unless there is substantial evidence that the allegedly (comparatively) negligent party could have seen the danger and could have taken effective precautionary action to avoid it." *Rider v. The Young Men's Christian Assoc. of Greater Kansas City*, 460 S.W.3d 378, 384 (Mo. App. 2015). By not objecting to the submission of the comparative fault instruction, Brizendine essentially concedes that, without the headlamp or flashlight evidence, there was sufficient evidence to submit to the jury the issue of whether she could have seen the danger and could have taken effective precautionary action to avoid it.

11

that the only reason she knew the ditch was there was because Brizendine had "crushed the foliage down" in the ditch when she fell. Ring testified that he was not able to see the ditch and that the ditch just looked like grass to him.

In addition to Wexter and Ring, however, Pat Maxwell, Bartlett's elevator superintendent, also testified about the condition and visibility of the ditch. Maxwell testified in his deposition that Bartlett hired a company to "take care" of the weeds along the ditch and that there was not an overgrowth of weeds hiding the ditch. He further testified that the ditch was "obvious" and could be seen right next to the entrance road. In the four years that Bartlett had owned the property, no one had ever complained to Maxwell that the ditch was dangerous or that he needed to warn people about it. Viewed in the light most favorable to the verdict, a reasonable inference from Maxwell's testimony was that the ditch was visible with the use of a headlamp or flashlight. That Wexter and Ring testified to the contrary was a conflict in the evidence for the jury to resolve and did not affect the admissibility of the headlamp and flashlight evidence.

Evidence that Brizendine failed to use her headlamp or flashlight on the night of her injury was relevant to the jury's determination as to whether she used the degree of care that an ordinarily careful person would use under the same or similar circumstances. The evidence did not mislead the jury. Therefore, the court did not abuse its discretion in refusing Brizendine's withdrawal instruction.[2] Because the

---

[2] That Brizendine first injected the headlamp and flashlight issue and evidence at trial further supports our holding. *Rouse v. Cuvelier*, 363 S.W.3d 406, 416 n.6 (Mo. App. 2012). "Under the invited error rule, 'a party is estopped from complaining of an error of his own creation, and

12

evidence was properly before the jury, the court did not abuse its discretion in allowing Bartlett to rely upon it to argue Brizendine's comparative fault in closing argument. *See Peterson v. Progressive Contractors, Inc.*, 399 S.W.3d 850, 856 (Mo. App. 2013) (quoting proposition from *Heshion Motors, Inc. v. W. Int'l Hotel*s, 600 S.W.2d 526, 534 (Mo. App. 1980), that "'the permissible field of argument is broad, and so long as counsel does not go beyond the evidence and the issues drawn by the instructions, or urge prejudicial matters or a claim or defense which the evidence and issues drawn by the instructions do not justify, he is permitted wide latitude'"). Points I through VI are denied.

In Point VII, Brizendine contends the court abused its discretion in allowing Bartlett to cross-examine her about the circumstances surrounding her change of employment after she was injured. Specifically, Bartlett asked Brizendine about a written warning she received at Cerner for "inappropriate language and phraseology" that she used with a colleague several months after her injury and three months before she left Cerner. Bartlett also asked Brizendine about a notation in her employment records stating that she was ineligible for rehire at

committed at his request.'" *Id*. (quoting *Sprague v. Sea*, 152 Mo. 327, 53 S.W. 1074, 1078 (Mo. 1899)). Brizendine's reliance on *Sampson v. Missouri Pacific Railroad Company*, 560 S.W.2d 573, 583-84 (Mo. banc 1978), and *Womack v. Crescent Metal Products, Inc.*, 539 S.W.2d 481, 483-85 (Mo. App. 1976), to argue that the invited error rule does not apply in her case is misplaced. The party seeking the withdrawal instruction in those cases introduced the objectionable evidence out of necessity to prove a different issue critical to the case (*Sampson*) or out of inadvertence (*Womack*). *Sampson*, 560 S.W.2d at 584; *Womack*, 539 S.W.2d at 485. Here, Brizendine's counsel raised the issue during his opening statement, specifically noting that, in determining whether Brizendine "had done anything wrong" on the night she was injured, he considered the fact that she had a helmet with a headlamp on it. Brizendine was also the first to elicit the headlamp and flashlight evidence. After Wexter testified that she was "suited up" and had her headlamp but not her helmet on, Brizendine's counsel specifically asked her, "You had your headlamp on your head or did you have a flashlight?"

Cerner, and Bartlett asked Brizendine if she was aware that her Cerner employment records "seem[ed] to suggest that [she] was terminated as opposed to resigned." Brizendine argues that this inquiry and the content of the records were not logically or legally relevant, were not proper impeachment or contradiction, and improperly attacked her character. We disagree.

From the outset of the case, Brizendine made the effect of her injury on her employment an issue in the case. In her petition, she alleged that, as a result of her injury, she was "unable to perform her regular job duties, missed work and has lost wages and will in the future continue to lose income" and that "her earning capacity has been permanently impaired." At trial, Brizendine's counsel stated in opening statements that she left her job at Cerner "because of the effect of her physical injuries and took a job at KU in a lesser demanding security post, but at the same rate of pay." Brizendine's counsel also told the jury that, before Brizendine left Cerner, Cerner was in the process of changing the unarmed guard positions to armed guard positions with more demanding physical requirements, and that her orthopedic surgeon had opined that she would have problems meeting those physical requirements. During her case-in-chief, Brizendine offered her orthopedic surgeon's testimony that she would have difficulty performing the tasks required of an armed guard position at Cerner due to her injury.

Bartlett's inquiry on cross-examination into the Cerner employment records was logically relevant, because it bore on the issue of whether Brizendine left her employment at Cerner due to the injury's effect on her ability to perform the job

14

requirements or for another reason unconnected to her injury. As for Brizendine's claim that this evidence was not legally relevant because it was unduly prejudicial and improperly attacked her character, we note that Bartlett did not even mention any of the Cerner evidence in its closing argument, let alone use it to attack Brizendine's character. The court did not abuse its discretion in allowing cross-examination on the circumstances surrounding Brizendine's change of employment after her injury. Point VII is denied.

## CONCLUSION

The circuit court's judgment is affirmed.

_____
LISA WHITE HARDWICK, JUDGE

ALL CONCUR.

15